1   GLYNN & FINLEY, LLP
    ADAM FRIEDENBERG, Bar No. 205778
2   JONATHAN A. ELDREDGE, Bar No. 238559
    One Walnut Creek Center
3   100 Pringle Avenue, Suite 500
    Walnut Creek, CA 94596
4   Telephone: (925) 210-2800
    Facsimile: (925) 945-1975
5   E-mail: afriedenberg@glynnfinley.com
            jeldredge@glynnfinley.com
6
    Attorneys for Defendant
7   ConocoPhillips Company

**E-filing**

8

9           UNITED STATES DISTRICT COURT

10   NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

11

12   SAHBHAGI CORPORATION, a California       )   Case No.
     corporation,                             )   CV 09 4053
13                                            )   NOTICE OF REMOVAL OF ACTION
                        Plaintiff,            )   UNDER 28 U.S.C. § 1441
14                                            )
          vs.                                 )
15                                            )
     CONOCOPHILLIPS COMPANY, a Texas          )
16   corporation and DOES 1 through 10,       )
     Inclusive,                               )
17                                            )
                        Defendants.           )
18   ─────────────────────────────────────────)

19

20       TO THE CLERK OF THE ABOVE ENTITLED COURT:

21           PLEASE TAKE NOTICE that pursuant to 28 U.S.C. section 1441, defendant

22   ConocoPhillips Company ("COP") hereby removes to this Court the state court action described

23   below:

24       1.     On July 30, 2009, this action was commenced in the Superior Court of the

25   State of California in and for the County of San Mateo, entitled "*SAHBHAGI CORPORATION, a*

26   *California Corporation, Plaintiff, vs. CONOCOPHILLIPS COMPANY, a Texas Corporation and*

27   *DOES 1 through 10, inclusive, Defendants,*" Case Number CIV486410.  A copy of the summons

28   and complaint is attached hereto as **Exhibit A**.

1        2.    COP was formally served with the complaint and summons on August 11,

2    2009.

3        3.    The complaint alleges that COP has violated the California Franchise

4    Investment Law, California Corporations Code sections 31000 et seq., the California Unfair

5    Competition Law, California Business and Professions Code sections 17200 et seq., and requests

6    declaratory relief.  Plaintiff alleges *inter alia* that COP failed to disclose rent increases, credit and

7    debit card fees and its intention to sell certain station properties to the franchisee at renewal, and

8    seeks a preliminary and permanent injunction preventing the implementation of the rent

9    increases, credit and debit card fees and the assignment of the franchise.

10        4.    Plaintiff's allegations are mostly identical to allegations made in 12 cases

11    that are currently pending in the Northern, Eastern, Central and Southern Districts of California.

12    (See Notice of Related Cases.)  Those cases have recently been consolidated for pre-trial

13    purposes in the Northern District of California by the Judicial Panel on Multidistrict Litigation in

14    the MDL entitled *In re ConocoPhillips Co. Service Station Rent Contract Litigation*, MDL No.

15    2040.  COP intends to seek consolidation of this case in the MDL as well.

16    **JURISDICTION**

17        5.    This action is removable to this Court pursuant to the provisions of 28

18    U.S.C. section 1441:

19        (a)    This Court has original jurisdiction over this action under 28

20    U.S.C. section 1332, in that it is a civil action between citizens of different states and the matter

21    in controversy exceeds the sum of $75,000, exclusive of interest and costs:

22        (i)    Plaintiff is a citizen of California.  (See Exh. A at ¶ 1; Exh.

23    B [California Secretary of State Registration].)

24        (ii)    Defendant COP is a Delaware corporation with its principal

25    place of business in Houston, Texas.  (See Declaration of Phillip L. Bonina ("Bonina Decl."), ¶

26    2.)

27        (iii)    Plaintiff seeks a preliminary and permanent injunction

28    preventing COP from *inter alia* implementing its Rent Policy.  (Exh. A at ¶¶ 13, 17, 25, 32 and

- 2 -

1   37.)  The Rent Policy is a four year policy that if enjoined would result in pecuniary loss to COP

2   in excess of $75,000.  (See Bonina Decl., ¶ 4.)  Thus, the amount in controversy exceeds

3   $75,000.[1]  (See *In re Ford Motor Company / Citibank (South Dakota), N.A.* (9th Cir. 2001) 264

4   F.3d 952, 958 ["where the value of a plaintiff's potential recovery (in this case, a maximum of

5   $3,500) is below the jurisdictional amount, but the potential cost to the defendant of complying

6   with the injunction exceeds that amount, it is the latter that represents the amount in controversy

7   for jurisdictional purposes."]; *In re Brand Name Prescription Drugs Antitrust Litigation* (7th Cir.

8   1997) 123 F.3d 599, 610 ["Still another way in which the requirement of the statutory minimum

9   amount in controversy can be satisfied in an injunctive case is by showing that the injunction

10  would force the defendant to forgo a benefit to him that is worth more than the threshold amount

11  specified in the diversity statute, [citation], as where the suit asks that the defendant be enjoined

12  from completing a lucrative transaction."].)

13                    **INTRADISTRICT ASSIGNMENT**

14          6.      Pursuant to Northern District Local Rules 3-5(b) and 3-2(d) or (e), this

15  case is properly removed to this division.  However, COP will promptly seek consolidation of

16  this action as a related case with other pending actions in MDL No. 2040 in front of The

17  Honorable Ronald M. Whyte pursuant to Northern District Local Rule 3-12.

18          Dated:  September _l_, 2009

19                                  GLYNN & FINLEY, LLP
                                    ADAM FRIEDENBERG
20                                  JONATHAN A. ELDREDGE

21                                  By
                                       Attorneys for Defendant
22                                     ConocoPhillips Company

23

24

25  [1]      Plaintiff also seeks preliminary and permanent injunctions preventing COP from charging
26  fees on credit and debit card processing, and assigning Plaintiff's franchise agreement as part of a
    sale of the station property.  (Exh. A at ¶¶ 18-23, 25 and 37.)  The potential pecuniary loss to
27  COP from these requested injunctions must also be considered to determine the amount in
    controversy.  However, these amounts need not be quantified at this time, as the potential loss to
28  COP from the requested injunctive relief regarding the Rent Policy alone exceeds $75,000.

- 3 -

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441

# EXHIBIT A

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ConocoPhillips Company, a Texas Corporation and DOES 1 though 10, Inclusive

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**ENDORSED FILED**
**SAN MATEO COUNTY**

JUL 3 0 2009

Clerk of the Superior Court
By _____ R. Lopez
**DEPUTY CLERK**

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Sahbhagi Corporation, a California Corporation

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Southern Branch: Hall of Justice and Records
400 County Center
400 County Center
Redwood City, CA 94063
Southern Branch

CASE NUMBER *(Número del Caso):* **CIV 4 8 6 4 1 0**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Thomas P. Bleau, Esq. SBN 152945        323-874-8613        323-874-1234
Bleau Fox, A P.L.C.
3575 Cahuenga Blvd. West, Suite 580
Los Angeles, CA 90068

DATE: July 3 0 2009
*(Fecha)* JUL 3 0 2009        JOHN C. FITTON        **R. LOPEZ**
                              Clerk, by _____, Deputy
                              *(Secretario)*              *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* CONOCOPHILLIPS COMPANY, A TEXAS CORPORATION

under:  ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
        ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
        ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
        ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]



SUMMONS

Legal
Solutions
& Plus

Code of Civil Procedure §§ 412.20, 465

Page 1 of 1

1  Thomas P. Bleau, Esq., SBN 152945
   Gennady L. Lebedev, Esq., SBN 179945
2  Melissa J. Rhee, Esq., SBN 253240
   BLEAU FOX, a P.L.C.
3  3575 Cahuenga Boulevard West, Suite 580
   Los Angeles, California 90068
4  Telephone: (323) 874-8613
   Facsimile: (323) 874-1234
5
   Attorneys for Plaintiff,
6  SAHBHAGI CORPORATION

**ENDORSED FILED**
SAN MATEO COUNTY

JUL 3 0 2009

Clerk of the Superior Court
By _____ R. Lopez
        DEPUTY CLERK

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   FOR THE COUNTY OF SAN MATEO

10 SAHBHAGI CORPORATION, a California ) CASE NO.   **CIV 4 8 6 4 1 0**
   Corporation,                        )
11                                     ) COMPLAINT FOR:
                  Plaintiff,           )
12                                     )
   vs.                                 )
13                                     ) 1.  **DAMAGES AND INJUNCTIVE
                                       )     RELIEF UNDER THE CALIFORNIA
14 CONOCOPHILLIPS COMPANY, a Texas     )     FRANCHISE ACT (CAL. CORP.
   corporation and DOES 1 through 10,  )     CODE §31000, et seq.)
15 Inclusive                           )
                                       ) 2.  **INJUNCTIVE, RESTITUTION AND
16                Defendants.          )     OTHER EQUITABLE RELIEF
                                       )     VIOLATIONS OF CALIFORNIA
17 _____    )     BUSINESS AND PROFESSIONS
                                       )     CODE §17200, ET SEQ.**
18                                       3.  **DAMAGES, INJUNCTIVE AND
19                                           EQUITABLE RELIEF
                                             (VIOLATIONS OF
20                                           CALIFORNIA BUSINESS AND
                                             PROFESSIONS CODE §21140,
21                                           ET SEQ.)**

22                                       4.  **DECLARATORY RELIEF**

23                                       **DEMAND FOR JURY TRIAL**

24                         PRELIMINARY ALLEGATIONS

25     1.  Plaintiff, SAHBHAGI CORPORATION, ("Plaintiff"), is a California Corporation that

26 operates a motor fuel service station located at 2000 Rollingwood Drive, San Bruno, California 94066

27 ("Plaintiff's station").

28     2.  Plaintiff is informed and believes and based thereon alleges that Defendant,

                                   -1-
                               COMPLAINT

1  CONOCOPHILLIPS COMPANY, (hereinafter referred to as "CONOCO") is now, and at all times

2  mentioned herein was, a corporation doing business in the State of California with its headquarters

3  and principal place of business in Houston, Texas.

4      3.  Plaintiff is not aware of the true names or capacities, whether individual, corporate,

5  associate or otherwise, of Defendants named herein as DOES 1 through 10, Inclusive, and therefore

6  sues these Defendants by such fictitious names.  Plaintiff shall amend this Complaint to allege the true

7  names and capacities of the fictitiously named Defendants when ascertained.  Plaintiff is informed and

8  believes and on that basis alleges that each of the fictitiously named Defendants is in some manner

9  intentionally or negligently responsible for the things herein alleged and the damages suffered by the

10  Plaintiff.

11      4.  Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants,

12  fictitious and real, are responsible in some manner for the occurrences herein alleged, and that

13  Plaintiff's damages as herein alleged were proximately caused by their conduct.

14      5.  Plaintiff is informed and believes, and based thereon alleges, that at all times herein

15  mentioned, each of the fictitiously named Defendants was the agent, servant, employee, co-venturer

16  and/or alter ego of each of the remaining fictitiously named Defendants and were acting within the

17  course, scope, purpose, consent, knowledge and authorization of such agency, employment and/or

18  joint venture and each fictitiously named Defendant has ratified and approved the acts of his, her

19  and/or its agent.

20      6.  Whenever in this complaint reference is made to "Defendants, and each of them," such

21  allegation shall be deemed to mean the acts of Defendants acting individually, jointly and/or severally.

22                  <u>GENERAL ALLEGATIONS</u>

23      7.  Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned in

24  this complaint, Defendants were the agents, employees and/or joint venturers of their co-defendants,

25  and in doing the things alleged in this complaint were acting within the course and scope of that

26  agency, co-employment and/or joint venture.

27      8.  Plaintiff is a petroleum franchisee.

28      9.  Defendant is a petroleum franchisor.

10. At all relevant times herein, Plaintiff has leased the afore-mentioned petroleum marketing premises from CONOCO for the purpose of operating Plaintiff's station under the Union 76 brand.

11. At all relevant times herein, Plaintiff and the previous franchisee were in a franchise relationship with CONOCO, operating Plaintiff's station as a CONOCO franchisee pursuant to a "76 Dealer Station Lease and Motor Fuel Supply Agreement" (hereinafter referred to as the "Franchise Agreement").

12. Pursuant to Section 3c of the Franchise Agreement, the previous franchisee's rent was set at $5,268.

13. On March 24, 2009, CONOCO notified the previous franchisee that it was increasing Plaintiff's rent for the station to $8,172 effective July 1, 2009.

14. Plaintiff is informed and believes and based thereon alleges that CONOCO's new rent program was not adopted in good faith and in the ordinary course of business. Instead, CONOCO adopted its new rent program as a pretext and leverage to force dealers, including Plaintiff and the previous franchisee, to accept "voluntary," oppressive, long-term supply agreements as a condition to CONOCO's sale of dealer operated stations at inflated purchase prices.

## FIRST CLAIM FOR RELIEF

**(For Damages, Injunctive Relief and Equitable Relief, Exemplary Damages, against CONOCO For Violations Of California Corporations Code ¶31000, et seq.)**

15. Plaintiff incorporates and re-alleges the allegations of paragraphs 1 through 14, inclusive, as if fully set forth herein.

16. Plaintiff is informed and believes and based thereon alleges that CONOCO's new rent program is a violation of the California Franchise Investment Law because, in addition to other violations, CONOCO did not provide Plaintiff or the previous franchisee with a franchise disclosure statement setting forth the required disclosures under California *Corporations Code*, including but not necessarily limited to, California *Corporations Code* §31100 et seq. and §31101 et seq. at the time CONOCO renewed Plaintiff's Franchise Agreement. By way of example, a copy of a typical Franchise Disclosure Statement utilized by another petroleum franchisor in California is attached hereto as Exhibit A. On information and belief, CONOCO failed to provide the requisite Franchise Disclosure

1   Statement to Plaintiff and the previous franchisee at the time of renewal nor did CONOCO register

2   the franchise with the State of California.

3       17.  Plaintiff is informed and believes and based thereon alleges that CONOCO's failure to

4   register with the State of California and/or set forth its intention to increase Plaintiff's rent at Plaintiff's

5   station, as well as the amount of such contemplated increase, prior to expiration of Plaintiff's

6   Franchise Agreement within a Franchise Disclosure Statement at the time CONOCO renewed

7   Plaintiff's Franchise Agreement is a violation California *Corporations Code* §31100 et seq.

8       18.  Plaintiff is informed and believes and based thereon alleges that CONOCO charges

9   Plaintiff credit and debit card processing fees on every credit and debit card transaction at Plaintiff's

10  station.

11      19.  Plaintiff is informed and believes and based thereon alleges that CONOCO receives a

12  portion of the processing fees on every credit and debit card transaction at Plaintiff's station.

13      20.  Plaintiff is informed and believes and based thereon alleges that CONOCO's failure to

14  register the franchise with the State of California and/or set forth the actual amount of credit and debit

15  fees charged by CONOCO in a Franchise Disclosure Statement at the time CONOCO renewed

16  Plaintiff's Franchise Agreement is a violation of California Corporations Code §31100 et seq.

17  CONOCO's credit and debit card processing fees charged to Plaintiff constitute a de facto franchise

18  fee within the meaning of California Corporations Code §31011 et seq. because they are above and

19  beyond a reasonable service charge paid to the processor of authorized credit and debit cards and

20  Plaintiff is entitled to reimbursement of same.

21      21.  Plaintiff is informed and believes and based thereon alleges that CONOCO intended to

22  assign Plaintiff's Franchise Agreement to a third party as part of a bulk sale at the time CONOCO

23  renewed Plaintiff's Franchise Agreement.

24      22.  Plaintiff is informed and believes and based thereon alleges that CONOCO's failure to

25  inform Plaintiff of its intent to assign Plaintiff's Franchise Agreement in a Franchise Disclosure

26  Statement at the time CONOCO renewed Plaintiff's Franchise Agreement is a violation of California

27  *Corporations Code* §31100 et seq.

28      23.  Plaintiff is informed, believes and based thereon alleges that CONOCO's failure to disclose

-4-
COMPLAINT

1    the actual amount of the rent increases at Plaintiff's station, the amount of the credit and debit card

2    processing fees received by CONOCO and of CONOCO's intent to assign Plaintiff's Franchise

3    Agreements at the time of renewal are all violations of California *Corporations Code* §31201 and

4    §31202 et seq.

5        24. Plaintiff has suffered special, general and consequential damages as a result of CONOCO's

6    unlawful conduct in an amount to be proven at the time of trial and are entitled to recover such

7    damages pursuant to California Corporations Code §31300 et seq.. However, Plaintiff is informed

8    and believes and based thereon alleges that such damages are less than $75,000.

9        25. Plaintiff has no plain, speedy and adequate remedy at law and therefore Plaintiff is entitled

10   to a temporary restraining order, preliminary injunction and permanent injunction restraining and

11   enjoining CONOCO, it agents, employees, officers, directors, managing agents, joint venturers,

12   attorneys, affiliates, subsidiaries, or assignees, from engaging in further violations of California

13   *Corporations Code* §31100 et seq., 31201 & 31202 et seq., implementing the Rent Modification,

14   charging fees for credit and debit card processing, assigning Plaintiff's Franchise Agreements and

15   prohibiting CONOCO from engaging in any retaliatory conduct for bringing the instant action.

16       26. Any hardships imposed on CONOCO, as the franchisor, by a temporary restraining order,

17   preliminary injunction and/or permanent injunction prohibiting further violations of California

18   *Corporations Code* §31100 et seq., 31201 & 31202 et seq. by CONOCO would be far less than the

19   enormous hardship imposed on the Plaintiff if the injunctive relief sought were not granted.

20                       **SECOND CLAIM FOR RELIEF**

21   **(Injunctive, Restitution and other Equitable Relief Against CONOCO for Violations of**

22              **California Business and Professions Code §17200, et seq.)**

23       27. Plaintiff incorporates and re-alleges the allegations of paragraphs 1 through 26, inclusive,

24   as if fully set forth herein.

25       28. Plaintiff is informed and believes, and based thereon alleges, that CONOCO, Plaintiff's

26   franchisor, has engaged in unfair and fraudulent business practices against Plaintiff, its franchisee,

27   within the meaning of California *Business and Professions Code* §17200, et seq.

28       29. As a franchisee, Plaintiff is required to purchase all of Plaintiff's gasoline at prices

1    unilaterally set by CONOCO rather than purchase gasoline from any other wholesaler at the most

2    competitive price available, to pay the rent set forth in the lease at the time of the renewal and to pay

3    significant credit and debit card processing fees to CONOCO for credit and debit card transactions

4    at Plaintiff's station.

5        30.   In exchange for the significant burdens, restrictions and limitations placed upon Plaintiff

6    as a 76 Branded franchisee, Plaintiff is entitled to reap the benefits of the franchise relationship,

7    including but not limited to, institutional advertising, marketing support, goodwill value associated

8    with operating the business and other related benefits.

9        31.   Plaintiff has spent substantial sums of money to purchase and develop Plaintiff's franchise,

10   customer base and 76 Brand loyalty in its community.

11       32.   Plaintiff is informed and believes and based thereon alleges that, CONOCO's improper

12   increase in the rent at Plaintiff's stations will destroy the goodwill value of Plaintiff's business, cause

13   Plaintiff serious financial injury and CONOCO's Rent Modification is a violation of California

14   *Corporations Code* §31100 et seq., 31201 & 31202 et seq. which constitutes an unfair and fraudulent

15   business practice in violation of California *Business and Professions Code* §17200.

16       33.   Plaintiff has also has been injured by CONOCO's undisclosed credit and debit card fees

17   charged to Plaintiff and intention to assign Plaintiff's Franchise Agreement to a third party in violation

18   of California *Corporations Code* §31100 et seq., 31201 & 31202 et seq. which constitutes an unfair

19   and fraudulent business practice in violation of California *Business and Professions Code* §17200.

20       34.   Plaintiff has also been injured by CONOCO's violations of §21140 et seq. and §21148 et

21   seq.  CONOCO intentionally and unlawfully conditioned its consent of the subject franchise transfer

22   to the Plaintiff only if the Plaintiff agreed to waive its rights and remedies with regard to the herein-

23   referred to rent increase.  Specifically, Conoco informed the Plaintiff in writing that at the time of the

24   "dealer change," the rent will increase from $5,268.00 to $8,172.00 per month as a condition of

25   CONOCO approving the assignment.

26       35.   Plaintiff is informed and believes, and based thereon alleges, that California *Business and*

27   *Professions Code* §21148 prohibits a franchisor, such as CONOCO, from unlawfully withholding or

28   conditioning its consent to the sale, transfer or assignment of a franchise, such as Plaintiff's.

36. Plaintiff has no plain, speedy and adequate remedy at law.

37. Plaintiff is therefore entitled to a temporary restraining order, preliminary injunction and permanent injunction restraining and enjoining CONOCO, it agents, employees, officers, directors, managing agents, joint venturers, attorneys, affiliates, subsidiaries, or assignees, from engaging in any further unfair and fraudulent business practices against Plaintiff, including but limited to, implementing its Rent Modification, charging Plaintiff credit and debit card fees, assigning Plaintiff's Franchise Agreement to a third party and prohibiting CONOCO from engaging in any retaliatory conduct for bringing the instant action.

38. Any hardships imposed on CONOCO, as the franchisor, by a temporary restraining order, preliminary injunction and/or permanent injunction prohibiting further unfair and fraudulent business practices by CONOCO would be far less than the enormous hardship imposed on the Plaintiff if the injunctive relief sought were not granted.

39. Plaintiff is also entitled to and requests restitution in an amount according to proof at the time of trial.

### THIRD CLAIM FOR RELIEF

**(For Damages, Injunctive Relief and Equitable Relief Against CONOCO for Violations of California Business and Professions Code §21140, et seq.)**

40. Plaintiff incorporates and re-alleges the allegations of paragraphs 1 through 39, inclusive, as if fully set forth herein.

41. Plaintiff is informed and believes, and based thereon alleges, that CONOCO is a "franchisor" within the meaning of California *Business and Professions Code* §21140 et seq.

42. Plaintiff is informed and believes, and based thereon alleges, that Plaintiff is a "franchisee" within the meaning of California *Business and Professions Code* §21140 et seq.

43. Plaintiff is informed and believes, and based thereon alleges, that Plaintiff's petroleum marketing franchise is a "leased marketing premise" within the meaning of California *Business and Professions Code* §21140 et seq.

44. Plaintiff is informed and believes, and based thereon alleges, that California *Business and Professions Code* §21140, et seq., was meant to promote the well being of service station

1   franchisees which is essential to the fair and efficient functioning of a free market economy within

2   the petroleum industry.

3       45.  Plaintiff is informed and believes, and based thereon alleges, that California *Business*

4   *and Professions Code* §21148 et seq., prohibits a franchisor, such as CONOCO, from unlawfully

5   withholding or conditioning its consent to the sale, transfer or assignment of a franchise, such as

6   Plaintiff's.

7       46.  Plaintiff is informed and believes, and based thereon alleges, that the relevant

8   provisions of California *Business and Professions Code* §21140, et seq., are not preempted by the

9   federal Petroleum Marketing Practices Act pursuant to *California Service Station etc. v. Union*

10  *Oil Co.* (1991, 1st Dist.) 232 Cal. App. 3d 44, 283 Cal.Rptr. 279.  Also see  *Unocal Corp. v.*

11  *Kaabipour* (1999) 177 F.3d 755, certiorari denied 120 S.Ct. 614, 145 L.Ed.2d 509, and *Forty-*

12  *Niner Truck Plaza, Inc. v. Union Oil Co.* (1997) 68 Cal.Rptr.2d 532, 58 Cal.App.4th 1261,

13  rehearing denied, review denied.  As stated in *Forty-Niner Truck Plaza, Inc,* "the preemption

14  provision of the PMPA is limited to provisions of state law dealing with the termination or

15  nonrenewal of franchise relationships [where state law differs from the PMPA]."... "That the state

16  chooses to regulate relationships that are not [covered] under the PMPA... would merely

17  compliment the federal regulatory purpose and scheme."

18      47.  Plaintiff is informed and believes, and based thereon alleges, that CONOCO has

19  violated California *Business and Professions Code* §21148 in that CONOCO intentionally and

20  unlawfully conditioned its consent of the subject franchise transfer to Plaintiff only if Plaintiff

21  agreed to waive its rights and remedies with regard to the afore-mentioned rent increase.

22  Specifically, CONOCO informed Plaintiff that at the time of the "dealer change," the rent will

23  increase from $5,268.00 to $8,172.00 per month as a condition of CONOCO approving the

24  assignment.

25      48.  Plaintiff is informed and believes, and based thereon alleges, that CONOCO has

26  violated California *Business and Professions Code* §21148 et seq. in that CONOCO has,

27  deliberately engaged in a course of conduct designed to fraudulently force dealers, such as

28  Plaintiff, to agree to onerous and unlawful franchise terms and waivers of rights and remedies in

1    order to obtain CONOCO's consent to the transfer of the franchise.

2         49.  According to the legislative purpose and intent of California *Business and Professions*

3    *Code* §21148 et seq. and the holding in *California Service Station etc. v. Union Oil Co.* (1991, 1st

4    Dist.) 232 Cal. App. 3d 44, 283 Cal.Rptr. 279, such conduct by CONOCO is prohibited because it

5    would allow franchisors to artificially, unreasonably and fraudulently restrict the franchisee's ability

6    to sell, transfer and/or assign the franchise.  The effect of such a policy, pattern and/or practice by

7    CONOCO is to invest CONOCO with virtually the same degree of absolute control over the

8    assignment of franchises that franchisors enjoyed prior to the enactment of California *Business and*

9    *Professions Code* §21148 et seq..

10        50.  As a direct result of CONOCO's violation of California *Business and Professions*

11   *Code* §21140, et seq., Plaintiff has been injured and damaged in an amount to be proven at the

12   time of trial including, but not limited to, loss of profit, goodwill and/or proceeds from the future

13   purchase/sale of Plaintiff's franchise.

14        51.  Plaintiff is also entitled to recover and requests three times the damages sustained by

15   Plaintiff as a result of CONOCO's violation of California *Business and Professions Code* §21148

16   et seq., in addition to attorney's fees and costs of suit pursuant to California *Business and*

17   *Professions Code* §21140.4 et seq.

18                          **FOURTH CLAIM FOR RELIEF**

19                       **(For Declaratory Relief Against CONOCO)**

20        52.  Plaintiff incorporates and re-alleges the allegations of paragraphs 1 through 51, inclusive,

21   as if fully set forth herein.

22        53.  A dispute has arisen and an actual controversy exists with respect to the rights of the

23   parties and the obligations of the parties with respect to the following:

24        a.  Whether CONOCO's rent increase is unlawful in light of CONOCO's failure to

25   provide Plaintiff with a Franchise Disclosure Statement as required by California law;

26        b. Whether CONOCO's credit and debit card processing fees are unlawful in light of

27   CONOCO's failure to set forth the actual amount of credit and debit fees charged by CONOCO in a

28   Franchise Disclosure Statement as required by California law;

1         c.  The rights and obligations of the parties under California *Corporations Code*

2  Section 31000, et seq.;

3         d.  The rights and obligations of the parties sunder California *Business and Professions*

4  *Code* §21140.4 et seq.

5         e.  Any other controversy of the parties relating to the Franchise Agreements entered

6  into between them, the validity of CONOCO's actions and the proper interpretation of Plaintiff's

7  statutory claims at issue in this action, which the Court determines is a genuine controversy in need

8  of resolution.

9      54.  Therefore, Plaintiff seeks a declaration of the rights and obligations of the parties with

10  respect to the controversies referred to above.

11      WHEREFORE, Plaintiff prays for judgment as follows:

12  With respect to the First Claim for Relief, an order granting:

13      1.  Special, general, statutory and consequential damages as a result of CONOCO's

14  unlawful conduct in an amount to be proven at the time of trial;

15      2.  A temporary restraining order, preliminary injunction and permanent injunction

16  compelling, restraining and enjoining CONOCO, its agents, employees, officers, directors, managing

17  agents, joint venturers, attorneys, affiliates, subsidiaries, or assignees, from implementing CONOCO's

18  Rent Modification at Plaintiff's station, charging fees for credit and debit card processing, assigning

19  Plaintiff's Franchise Agreement and prohibiting CONOCO from engaging in any retaliatory conduct

20  for bringing the instant action;

21  With respect to the Second Claim for Relief:

22      3.  A temporary restraining order, preliminary injunction and permanent injunction

23  restraining and enjoining CONOCO, it agents, employees, officers, directors, managing agents, joint

24  venturers, attorneys, affiliates, subsidiaries, or assignees, from engaging in any further unfair and

25  fraudulent business practices against Plaintiff, including but limited to, implementing its Rent

26  Modification, charging Plaintiff credit and debit card fees, assigning Plaintiff's Franchise Agreements

27  to a third party and prohibiting CONOCO from engaging in any retaliatory conduct for bringing the

28  instant action;

4.      Restitution in an amount according to proof at the time of trial;

With respect to the Third Claim for Relief:

5.      Actual Damages in an amount to be proven at the time of trial for violations of California *Business and Professions Code* §21140, et seq.

6.      In accordance with California *Business and Professions Code* §21140.4, Plaintiff requests that judgment be entered for three times the amount at which Plaintiff's actual damages are assessed;

7.      Attorneys' fees and costs under California Business and Professions Code §21140.4 in connection with bringing the instant action;

With respect to the Fourth Claim for Relief:

8.      The rights and obligations of the parties under California *Corporations Code* § 31000, et seq.:

a.  Whether CONOCO's rent increase is unlawful in light of CONOCO's failure to provide Plaintiff with a Franchise Disclosure Statement as required by California law;

b.  Whether CONOCO's credit and debit card processing fees are unlawful in light of CONOCO's failure to set forth the actual amount of credit and debit fees charged by CONOCO in a Franchise Disclosure Statement as required by California law;

c.  The rights and obligations of the parties under California *Corporations Code* §31000, et seq.;

d.  The rights and obligations of the parties sunder California *Business and Professions Code* §21140.4 et seq.

9.      Any other controversy of the parties relating to the Franchise Agreements entered into between them, the validity of CONOCO's actions and the proper interpretation of Plaintiff's statutory claims at issue in this action, which the Court determines is a genuine controversy in need of resolution;

///

///

///

-11-

COMPLAINT

1    <u>With respect to All Claims for Relief:</u>

2         10.    Any other and further relief the Court deems just and proper.

3    Dated: July 24, 2009                    BLEAU FOX, A P.L.C.

4

5                                            By:

6                                               Thomas P. Bleau, Esq.
                                                Gennady L. Lebedev, Esq.
7                                               Melissa J. Rhee, Esq.
                                                Attorneys for Plaintiff,
8                                               SAHBHAGI CORPORATION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

  Disclosure to Prospective
Chevron Dealers - California

## CHEVRON PRODUCTS COMPANY

January 9, 2001


Service Station No.
CA

Dear Prospective Chevron Dealer:

As required by section 31101 of the California Corporations Code, Chevron Products Company, a division of Chevron U.S.A. Inc. ("Chevron"), discloses the following information to prospective Chevron dealers. In this document, Chevron dealers who lease service station premises from Chevron are referred to as "lessee dealers" and Chevron dealers who own their service station or lease it from a third party (not from Chevron) are called "owner dealers".

1.      Business Name. Chevron dealers in California enter into one or more agreements and do business with Chevron U.S.A. Inc. Chevron also does business with dealers under the fictitious business name of its Chevron Products Company division.

2.      Principal Business Address. Chevron's principal business address is 575 Market Street, San Francisco, California 94105. Service of process on Chevron may be made at that address upon Mr. H. P. Walker, Assistant Secretary of the corporation.

3.      Business Form. Chevron U.S.A. Inc. is a Pennsylvania corporation.

4.      Business Experience. Chevron and its parent corporation, Chevron Corporation, a Delaware corporation ("Chevron's parent company"), have been engaged in the business, among others, of marketing gasoline and other petroleum products for more than 50 years and during that time have supplied such products to independent jobbers and service station dealers. During that time, Chevron and Chevron's parent company have also sold such products to their customers through commission agents and directly to the public at stations operated by their employees.

5.      Dealer Agreements. It is proposed that Chevron and the Chevron dealer enter into each of the agreements listed below. Copies of these agreements (and the other related documents listed below) are attached hereto and incorporated herein. These agreements set forth the legal rights and obligations of Chevron and the Chevron dealer, and the dealer should study all of these agreements carefully before signing any of them.

    Dealer Lease (RT29250)
    Optional Temporary Partial Rent Waiver
        and Electronic Transaction Authorization Agreement (RT29251)
    Dealer Supply Contract (Lessee Dealers) (RT29260)
    Credit Card Authorization Letter (RT19270)
    Retail Automation System Amendment to Dealer Lease (RT29432)
    Octane Certification Letter (RT19255)
    Temporary Insurance Waiver (RT29453)
    Electronic Transaction Authorization Agreement (RT29252)
    Dealer Training Course Agreement -- Renewal Dealer (RT19412)
    Significant Changes Letter (RT29283)
    Split-Island Agreement (RT29392)
    California Amendment to Dealer Lease (RT19318)
    California Amendment to Dealer Supply Contract (RT19319)
    California Successor Designation (RT29315)
    Temperature Correction Agreement (RT19385)
    SNP Letter - Leased Property (RT29426)

RT29281 (11-99)

 

License -- Non-Service Station Use Agreement (RT29295)
License -- Non-Service Station Use Agreement (Lottery) (RT29297)

6.      Payments and Fees.

(a)      New Dealer Application and Training.  Chevron requires prospective new dealers to submit a Dealer Application and successfully complete Chevron's New Dealer Business Orientation Program.  Chevron charges a $500 application fee and a $4,500 fee for the training program.  The application fee is not refundable.  The fee for the New Dealer Business Orientation Program is refundable at a rate of $300 per business day that a prospective dealer does not attend the training program.  No portion of the training program fee is refundable if the prospective dealer fully attends the program but fails to successfully complete it or to become a Chevron dealer for any other reason.  Prospective dealers must also pay their own travel and living expenses to attend the training program.

(b)      Business Value Fee Program (New Lessee Dealerships).  When Chevron first leases a newly constructed station to a dealer, first leases a station to a dealer that Chevron has previously operated with employees or agents, first leases a station to a dealer when the station has been out of service, or otherwise first leases a station to a dealer (other than a renewal following an assignment), Chevron typically charges the dealer a business value fee for the privilege of becoming the Chevron lessee dealer at that location.  The amount of that fee is determined by negotiation between Chevron and the dealer.  Chevron frequently asks a number of qualified dealer candidates to bid the amount of the business value fee they would be willing to pay.  Except as set forth below, any such fee must be paid in full in cash at the time the Dealer Lease is executed.  All such payments are applied to Chevron's general funds.

The business value fee will be partially reimbursed to the dealer if the dealer surrenders possession of the station to Chevron at any time during the first seven years after the dealer first assumes possession of the station.  Chevron will reimburse the dealer that percentage of the business value fee equal to the percentage of such seven-year period remaining at the time the dealer surrenders possession of the station to Chevron.  No reimbursement will be due from Chevron to the dealer if the dealer surrenders possession of the station to Chevron as a result of termination or nonrenewal of the dealer's agreements with Chevron based in whole or in part upon a breach of any contractual obligation of the dealer to Chevron.  No reimbursement shall be due the dealer upon the sale or transfer of dealer's business and/or assignment by the dealer of his or her dealer agreements with Chevron to a third party approved by Chevron or upon the exercise by Chevron of any right of first refusal it may have in connection with the sale or transfer of the dealer's business.

If Chevron itself leases the property on which the station is located from a third party and Chevron's anticipated remaining tenure is less than seven years, the dealer will be required initially to pay to Chevron only a portion of the business value fee in accordance with the following schedule:

### BUSINESS VALUE FEE ADJUSTMENT FACTORS

| Percentage of Anticipated Location Tenure | Business Value Fee Payable Upon Execution |
|---|---|
| 7 years or more | 100% |
| 6 to 7 years | 80% |
| 5 to 6 years | 65% |
| 4 to 5 years | 50% |
| 3 to 4 years | 35% |
| 2 to 3 years | 20% |
| 1 to 2 years | 5% |
| 0 to 1 year | 0% |

If Chevron later obtains additional tenure which it is reasonably anticipated would allow the dealer to retain possession of the station for the full seven-year period, the dealer is required upon demand by Chevron to immediately pay Chevron the remaining portion of the full business value fee.

(c)      Transfer Fee Program (Lessee Dealers).  Whenever a lessee dealer sells, transfers or assigns his or her Dealer Lease and other agreements with Chevron, Chevron requires that the dealer pay a transfer fee to Chevron.  At present, the amount of the transfer fee varies depending on the length of time the outgoing dealer has been the Chevron dealer at the particular location:

RT29281 (11-99)

*Less than 3 years.* If at the time of the transfer the outgoing dealer's tenure at the location is less than 3 years, the transfer fee amount will be the greater of (i) 20% of the sales price for the dealership, excluding any portion of the sales price reasonably attributable to equipment or resale merchandise, or (ii) $8,000.

*3 to 15 years.* If at the time of the transfer the outgoing dealer's tenure at the location is 3 years or more but less than 15 years, only the minimum transfer fee amount of $8,000 (designed to cover Chevron's costs to process the transfer) will be payable.

*15 years or more.* If at the time of the transfer the outgoing dealer's tenure at the location is 15 years or more, no transfer fee will be payable.

The transfer fee must be paid in full in cash by the outgoing dealer at the time of transfer. All such payments are applied to Chevron's general funds.

No transfer fee is payable:

- If the outgoing dealer has been the Chevron dealer at the particular location for 15 years or more.

- Upon any sale, transfer or assignment of the dealer agreements by a dealer to his or her designated successor-in-interest under California Business and Professions Code section 21140.6 (who must be a spouse or adult child of the dealer and meet all qualifications then required by Chevron for operation of a service station).

- Following a dealer's death, upon assumption of the dealer agreements by the dealer's designated successor-in-interest under California Business and Professions Code section 21140.6. Similarly, no transfer fee is payable upon any sale, transfer or assignment of the dealer agreements at any time by a dealer to the dealer's designated successor-in-interest.

- Upon any sale, transfer or assignment of the dealer agreements by an individual dealer to a corporation if the individual dealer owns a majority of the voting stock and any other stock of the corporation as well as a majority thereof after giving effect to the conversion of all securities convertible into stock of the corporation.

The following applies when computing the length of time that an outgoing dealer has been the Chevron dealer at the particular location for the purpose of determining the applicable transfer fee rate:

- Where an individual dealer has incorporated his or her business at a particular station and remains responsible for the corporate dealer as the individual Operator designated in the dealer agreements, the corporate dealer will be credited with the length of time that the individual was the Chevron dealer at the station.

- Where Chevron acquires a competitive location from another supplier and enters into Chevron dealer agreements with the competitive dealer, the dealer's tenure at the location with the previous supplier will be credited.

- If Chevron previously terminated or failed to renew the dealer at a former location in order to abandon it and the dealer subsequently acquired and began operating another Chevron dealership at a different location within one year from the date on which dealership operations at the former location ended, the dealer's tenure at the abandoned and new locations will be combined.

- A dealer who was the prior dealer's designated successor-in-interest at the location when the dealer acquired the dealership (either following the prior dealer's death or by a transfer during the prior dealer's lifetime) will be credited with the prior dealer's tenure at the location.

The transfer fee is payable upon any sale, transfer or assignment of the dealer agreements to Chevron (or Chevron's nominee) following an election by Chevron to exercise its right of first refusal.

RT29281 (11-99)

Any sale, transfer or assignment of the dealer's agreements with Chevron requires Chevron's prior written consent. As set forth in item 8 below, a dealer wishing to sell his or her business must extend to Chevron a right of first refusal on the purchase of that business.

Chevron reserves the right at any time to modify the amount of such transfer fee or the terms and conditions under which it will be payable.

7.   Other Payments and Fees.

(a)   General. Other payments that Chevron dealers may be required to make to Chevron are described below in this item 7. All such payments are applied to Chevron's general funds. Any rents represent the rental value of the property rented. Although none of these payments represents a "franchise fee" as that term is commonly understood, some of the payments described below may constitute a "franchise fee" within the definition of section 31011 of the California Corporations Code as interpreted by the California Department of Corporations.

(b)   Regular and Ongoing Payments. The attached agreements set forth all regular and ongoing payments that would be payable by the prospective dealer to Chevron. Most significantly, the dealer is required under section 3 of the Dealer Supply Contract to pay for resale merchandise purchased from Chevron, and under section 4 of the Dealer Lease (if any) to pay the stipulated rent for any service station premises leased from Chevron. (Lessee dealers are required under section 4 of the Dealer Lease to pay Chevron each month in advance a specified monthly base rental amount (which escalates 2% each lease year), one-twelfth of the yearly property taxes for the premises, and a $60 monthly contract administration fee. The property tax payments cover all real estate and personal property taxes of any kind and nature, including but not limited to any general or special assessments, which may be levied against the premises or any personal property owned by Chevron located on the premises during the term of the Dealer Lease.) If (as is almost always the case) the dealer uses Chevron's Retail Automation Network ("RAN") system, the dealer is also required to pay Chevron the rent and fees for the use of the RAN system specified in section 2 of the RAN System Amendment to Dealer Lease (lessee dealers) or the Retail Automation System Amendment to Dealer Supply Contract (owner dealers). Owner dealers are also required under section 17 of their Dealer Supply Contract to pay the stipulated rent for any of the designated equipment leased by the owner dealer from Chevron. (Some owner dealers may receive discounts off otherwise applicable dealer buying prices for motor fuels. Such discounts are determined by negotiation and may be reduced or withdrawn by Chevron at any time.) In addition, under section 3 of the Dealer Supply Contract and section 5 of the Dealer Lease, dealers are required to reimburse Chevron for certain specified taxes if payable by Chevron. If Chevron has entered into a License--Non Service Station Use Agreement with a lessee dealer, the dealer is required to pay the additional rent specified in section 3 of that agreement. If a dealer leases additional signs or other equipment from Chevron, the dealer is required to pay the applicable rent set forth in any such lease. If a dealer purchases products from Chevron in Chevron's returnable drums or pallets, the dealer is required to post Chevron's applicable deposit charge as security to ensure the return of the drum or pallet.

(c)   Optional Temporary Partial Rent Waiver (Lessee Dealers). If the attached documents include an Optional Temporary Partial Rent Waiver and Electronic Transaction Authorization Agreement, the dealer may (until notified otherwise by Chevron) elect to pay rent for the premises in accordance with the alternative rent clause set forth in that agreement, instead of the base rent and property tax amounts set forth in sections 4(a) and 4(b) of the Dealer Lease and the RAN System Fees set forth in section 2 of the RAN System Amendment to Dealer Lease. The contract administration fee payable under section 4(c) of the Dealer Lease is not subject to this rent waiver and is to be paid by lessee dealers even if they elect to pay rent for the premises under the alternative rent clause. Chevron shall have the right in its sole discretion to withdraw or modify the rent waiver set forth in any Optional Temporary Partial Rent Waiver and Electronic Transaction Authorization Agreement (i.e., a lessee dealer's right to pay rent under the alternative rent clause set forth in that agreement) arbitrarily and without cause at any time upon 60 days' prior written notice to the dealer. No Chevron employee has any authority to make any promises to any dealer or prospective dealer limiting the circumstances under which Chevron might withdraw or modify this waiver. If Chevron elects to withdraw this waiver, the dealer(s) affected will thereafter be required to pay the rent for the premises provided for in section 4 of the Dealer Lease and the RAN System Fees set forth in section 2 of the RAN System Amendment to Dealer Lease.

(d)   Credit Cards/Debit Cards. The attached credit card/debit card letter (if any) provides that Chevron's authorization to accept credit cards or debit cards approved by Chevron is subject to terms and conditions established periodically by Chevron. At present, Chevron does not impose a processing fee on Chevron credit card transactions. Chevron does impose a processing fee of 3% of the amount on the transaction on non-Chevron credit card transactions (e.g., Visa, MasterCard, Discover, American Express) reported to Chevron. A 3% fee also applies to "off-line" debit

card transactions handled by Chevron (i.e., those which do not require the cardholder to enter a personal identification number, or "PIN," and which are processed through credit card channels). Chevron charges a 1% fee on "on-line" debit card transactions (i.e., those that require a PIN, including "cash back" transactions. Most credit card and debit card transactions are submitted to Chevron electronically using Chevron's Retail Automation System. Chevron also currently charges a service fee of $2 per invoice for each handwritten credit card invoice submitted by a dealer to Chevron. Chevron reserves the right at any time to impose additional or different fees and charges as a condition of credit card or debit card authorization, including but not limited to a processing fee on each credit card transaction submitted by a dealer to Chevron.

(e)     Security Fund.  Chevron does not require Chevron dealers to make deposits into a security fund as a condition of doing business with Chevron. Chevron frequently elects, however, to extend credit for product purchases to creditworthy dealers. As a condition of the extension of such credit, Chevron generally requires dealers to establish a security fund to assure payment of moneys owed by them to Chevron. In such circumstances, Chevron will enter into a Security Fund Agreement with the dealer specifying the terms and conditions under which such deposits will be held by Chevron. The dealer may terminate the Security Fund Agreement at any time. Upon such termination, Chevron will return to the dealer any remaining balance in the fund, less any and all indebtedness (matured or unmatured) payable by the dealer to Chevron. At present, Chevron pays the Dealer interest on moneys deposited in any such security fund at a rate equal to 85% of the quarterly average of the 13-week U.S. Treasury Bill rate, rounded to the nearest 1/4% per year. Chevron reserves the right at any time upon notice to the dealer to change the rate at which such interest is paid, to eliminate the payment of such interest, or otherwise to change any of the other terms and conditions applicable to such security funds.

(f)     Electronic Funds Transfer.  As an additional condition of the extension of credit, Chevron also generally requires dealers to pay amounts owing to Chevron for product purchases or station rent by electronic funds transfer ("EFT") from a bank account established by the dealer for this purpose. At present, Chevron imposes a service fee upon dealers of $20 for any attempted EFT draw from the dealer's designated bank account that is rejected by the bank due to insufficient funds in the account.  Lessee dealers who elect to pay rent for the premises in accordance with the alternative rent provision set forth in the Optional Temporary Partial Rent Waiver and Electronic Transaction Authorization Agreement (see item 7(c) above) are required under section 1(g) of that agreement to pay rents by electronic funds transfer from the dealer's designated bank account to such Chevron bank account as may be designated by Chevron from time to time in Chevron's Rental Accounting Guide.

(g)     Image Equipment (Owner Dealers).  Dealers are required to meet Chevron's image standards for Chevron branded retail outlets. These include that a "spanner" be installed over each pump island and "canopy graphics" be installed on each canopy. Chevron pays for such image equipment at the service stations it leases to lessee dealers. Owner dealer are required to pay for such equipment at their stations. Spanners and canopy graphics are available only from Chevron or its designated supplier. The cost of spanners typically ranges from approximately $1,750 to $12,000 each, depending on construction materials, dimensions and type of illumination. The cost of canopy graphics typically ranges from approximately $400 to $4,000 per canopy.

(h)     Convenience Store Equipment and Training (Lessee Dealers).  As discussed in item 9 below, lessee dealers whose stations are reconstructed by Chevron are required to reimburse Chevron for the cost of any convenience store equipment and fixtures installed by Chevron at the premises that are required under section 6(b) of the Dealer Lease. Under section 7 of any attached Reconstruction Amendment to Dealer Lease and Dealer Supply Contract or Service Station Reconstruction Agreement, if Chevron's reconstruction work includes construction of a convenience store on the premises, the dealer is required to attend and complete Chevron's Store Retailing Education Program prior to completion of the reconstruction work. Dealers are required to pay Chevron a fee of $3,000 for this training, and must also pay their own travel and living expenses to attend this training program.

(i)     Motor Fuel Delivery.  Under section 3(a) of the Dealer Supply Contract, if there is inadequate storage capacity to accept any delivery of Chevron motor fuels ordered by the dealer and the delivery vehicle must leave the dealer's station without delivering all of the products ordered, the dealer shall be subject to an additional handling fee in the amount of $250, or in such other amount as Chevron may from time to time designate. The dealer shall also reimburse Chevron on demand for any demurrage or other charges incurred by Chevron by reason of the dealer's failure to unload any delivery vehicle or release the same within the time allowed therefor without demurrage or other charge.

(j)     Abandoned Property (Lessee Dealers).  Lessee dealers are required under section 10 of the Dealer Lease upon demand to reimburse Chevron for any expense incurred by Chevron in removing from the station property abandoned by the dealer after the lease ends.

RT29281 (11-99)

(k)    No Charges on Behalf of Third Parties.  Chevron does not charge dealers any royalty or payment or fee collected in whole or in part on behalf of any third party or parties.

8.    Termination/Nonrenewal; Chevron's Right of First Refusal.  The conditions under which the agreements between Chevron and a dealer may be terminated are set forth in such agreements.  In particular, see section 7 of the Dealer Supply Contract and section 7 of the Dealer Lease (if any).  Both Chevron and the dealer have the right to refuse to renew any agreements between them at the expiration of their stated term, subject to the valid requirements of any applicable statute, including the federal Petroleum Marketing Practices Act.

If a dealer wishes to sell, transfer or assign his or her agreements with Chevron to a qualified purchaser, then, pursuant to California Business and Professions Code section 21148 (and section 19 of the Dealer Lease), the dealer must offer in writing to sell, transfer or assign the dealership to Chevron on the same terms and conditions as those extended to the proposed purchaser.  Upon receipt of the written offer, Chevron or its nominee has 30 days in which it may accept or decline to purchase the dealership upon those terms and conditions.

9.    Required Purchases.  As discussed in item 7(g) above, owner dealers are required to purchase pump island spanners and canopy graphics from Chevron or its designated supplier.  A dealer's only other obligations to purchase services, supplies, products, fixtures and other goods from Chevron (or its designee) are set forth in sections 1 and 2 of the Dealer Supply Contract, section 6(b) of the Dealer Lease, and section 1 of any attached Reconstruction Amendment to Dealer Lease and Dealer Supply Contract or Service Station Reconstruction Agreement.  With respect to petroleum products, such obligations are subject to the provisions of section 6 of the Dealer Supply Contract regarding prevention of performance and shortage of supply.  Lessee dealers are required under section 6(b) of the Dealer Lease to provide all car wash equipment and fixtures and/or all convenience store equipment and fixtures necessary for the proper operation of any car wash or convenience store at the premises as specified in Chevron's Convenience Store Development Program Guide or as otherwise specified by Chevron in writing from time to time.  Section 6(b) of the Dealer Lease also requires that all car wash and convenience store equipment and fixtures provided by the lessee dealer must meet Chevron's written specifications for such types of equipment and fixtures as provided by Chevron to the dealer from time to time, and prohibits the lessee dealer from installing any convenience store equipment and fixtures except those authorized by Chevron in writing.  Under section 1 of the Reconstruction Amendment to Dealer Lease and Dealer Supply Contract and the Service Station Reconstruction Agreement, lessee dealers whose stations are reconstructed by Chevron are required, if the reconstruction work includes construction of a convenience store, to reimburse Chevron for the cost of the convenience store equipment and fixtures (other than items the dealer elects to lease from a third party) required by section 6(b) of the Dealer Lease, after Chevron initially purchases such items and installs them at the premises.

10.    Sales Limitations.  Chevron dealers are not limited to products or goods purchased from Chevron but may offer for sale products or goods from any source.  Lessee dealers are subject to certain restrictions regarding the operation and use of the leased service station premises, as set forth in section 2 of the Dealer Lease.

11.    Financing Arrangements.  The terms and conditions of any financing arrangements being offered by Chevron directly are set forth in the documents listed below:

Under its Convenience Store Development Program, Chevron has established financing arrangements with General Electric Capital Business Asset Funding Corporation ("GE Capital") under which GE Capital will make loans to qualifying lessee dealers whose stations are reconstructed by Chevron to include a convenience store, to assist the dealer in paying for the cost of the convenience store equipment and fixtures that the dealer is required to provide under section 6(b) of the Dealer Lease. (See items 7(h) and 9 above for more information regarding a lessee dealer's obligation to provide convenience store equipment and fixtures at the premises.)   To qualify for this financing, a lessee dealer must be approved by Chevron's Credit Department and execute a promissory note payable to the order of GE Capital for the loan amount.  Because Chevron will provide a payment guaranty to GE Capital with respect to loans made to Chevron dealers under this program, each participating dealer is also required (i) to agree in writing to indemnify Chevron against all payments, losses, expenses and other costs (including costs of suit and attorneys' fees) that Chevron may be required to make or incur under or with regard to its guaranty to GE Capital for the dealer's loan, and (ii) to grant Chevron a security interest in all equipment and fixtures owned by the dealer and located at the premises to secure the dealer's indemnity obligations to Chevron.  At present, the loans available from GE Capital under this program include fixed rate loans and variable rate loans for a seven-year term in the amount of 90% of the dealer's cost to purchase and install the required equipment and fixtures at the premises.

RT29281 (11-99)

The loan proceeds are remitted directly to Chevron to be applied towards the dealer's obligation to reimburse Chevron for the cost of initially purchasing and installing the equipment and fixtures at the premises. Loans are subject to acceleration (i.e., being repaid in full immediately) upon the occurrence of certain events, including the dealer's default in paying the loan, termination or nonrenewal of the dealer's agreements with Chevron for the premises, or the dealer's transfer of the premises without GE Capital's prior written consent. Loans are also subject to a default interest rate of the lesser of 15% per annum or the maximum rate permitted by law, and a late payment charge of the lesser of 5% of the delinquent payment or the highest additional charge permitted by law. This financing program is subject to change or cancellation at any time.

12.     Assignment of Dealer Obligations.  When Chevron makes a loan to a Chevron dealer or sells property to a dealer, it may on occasion assign the dealer's obligation to repay such loan or to pay for such property to a bank for collection. Other than such situations, Chevron has no past or present practice, nor does it have any present intent to sell, assign or discount to a third party any note, contract or other obligation of a Chevron dealer in whole or in part.

13.     No Sales or Earnings Projections.  Due to the various factors which may affect the performance of an individual place of business, Chevron does not supply statements of estimated or projected sales or earnings for a particular location to prospective Chevron dealers, nor has any employee of Chevron been authorized to make such statements.  If historical data regarding sales at the particular location are available, such data may be provided. However, Chevron makes no claim that historical sales performance is indicative of future performance or represents the true potential of the particular location.

14.     No Exclusive Territory.  Chevron dealers do not receive any exclusive area or territory, and Chevron reserves the right to establish additional outlets anywhere it chooses.

15.     Financial Statements.  Attached hereto are copies of unaudited financial statements of Chevron and audited, consolidated financial statements of Chevron's parent company, Chevron Corporation.

16.     Chevron Corporation Guaranty.  In view of Chevron's reliance on the audited financial statements of its parent company, Chevron Corporation shall guarantee the performance of Chevron's duties and obligations under the attached Dealer Lease (if any) and Dealer Supply Contract.  A copy of Chevron Corporation's guaranty is also attached hereto.

Very truly yours,

CHEVRON PRODUCTS COMPANY,
a division of Chevron U.S.A. Inc.

I have received and reviewed the foregoing disclosures, including each of the agreements listed in item 5 hereof and including any other documents attached hereto.

Dated: 02-13-2001



RT29281 (11-99)

California Dealers

## ATTACHMENT TO
## DISCLOSURE TO PROSPECTIVE CHEVRON DEALERS

I.    Copies of Financial Statements:

    A.    Chevron U.S.A. Inc. (Unaudited)
    B.    Chevron Corporation (Audited)

II.    Copy of Chevron Corporation Guaranty

EXHIBIT B

# California Business Portal

## Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of AUG 21, 2009 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| SAHBHAGI CORPORATION | | |
| **Number:** C3106456 | **Date Filed:** 11/14/2008 | **Status:** active |
| **Jurisdiction:** California | | |
| Address | | |
| 45670 MONTCLAIRE TER | | |
| FREMONT, CA 94539 | | |
| Agent for Service of Process | | |
| HARSHAD I PATEL | | |
| 45670 MONTCLAIRE TER | | |
| FREMONT, CA 94539 | | |

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.